**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE**

RICHARD W. PHELPS, D.D.S.                                                                    PLAINTIFF

v.                                                                                          NO.3:03-CV-226-JDM

UNUM PROVIDENT CORP., et al.                                                             DEFENDANTS

**MEMORANDUM OPINION**

The plaintiff, Richard W. Phelps, D.D.S., seeks continuing benefit payments under an individual disability policy as well as tort damages for statutory and common law claims of bad faith. The defendants, UnumProvident Corporation and UNUM Life Insurance Company of America, move for partial summary judgment on the bad faith claims. The plaintiff moves for partial summary judgment on the contract claim and elements of the bad faith claims. For reasons stated below, the court will grant summary judgment for the plaintiff on the contract claim and will dismiss the bad faith claims.

**I.**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The pivotal issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**II.**

The plaintiff has undergone hand surgery on two occasions to alleviate pain, weakness and stiffness in his right thumb.  The plaintiff is right hand dominant.  In 1999 at age 54, the plaintiff was diagnosed with osteoarthritis in both thumbs by Dr. Morton Kasden.  In December 1999, hand surgeon, Dr. Thomas Wolff, performed the first arthroplasty on the plaintiff's right thumb.  Arthroplasty entails removing the affected bone and reconstructing and stabilizing the ligaments to alleviate pain.  Despite at least one course of physical therapy to improve strength, pain and swelling, among other symptoms, the plaintiff's complaints did not resolve.  In April 2001, Dr. Wolff repeated the surgery.  Again, the plaintiff achieved only a limited recovery, such that by June 2002, Dr. Wolff noted that the plaintiff is not able to sustain a pincer grip and to work full-time.

Before the surgeries, the plaintiff had been engaged in the practice of dentistry since graduating from dental school in 1977, the year he, then aged 32, also purchased an individual, "own occupation" disability policy.[1]  The disability policy is noncancellable and guaranteed renewable to age 65.  The policy provides a monthly $1000 "total disability" benefit after an initial, 90-day elimination period.

In March 2000, three months after the first surgery, the plaintiff submitted a claim under his disability policy; and in April 2000, he began receiving monthly benefits.  In March 2002, the defendants notified the plaintiff that future payments would be made under a reservation of rights.  Then in September 2002, two-and-a-half years after the first disability payment, the

---

[1] "Own occupation" refers to the insured's specific occupation, as opposed to policies that provide coverage if disabled from any occupation, which by training, education and experience, the insured is qualified to perform. The distinction is discussed in *Ginsburg v. Insurance Co. of North America*, 427 F.2d 1318 (6th Cir. 1970).

-2-

defendants terminated the monthly benefits. The defendants ultimately denied the claim because in its view the plaintiff is only "partially disabled" and, thus, does not qualify for "total disability" benefits. The basis for denying the claim stems from the fact that the plaintiff returned to his dentistry practice part-time following both surgeries. Ultimately, the plaintiff closed the practice on March 1, 2005, after unsuccessful efforts to sell the business.

Before onset of the claimed disability, the plaintiff as a solo practitioner provided all manner of dental care including regular hygiene, although, for molar root canals and many extractions, he referred patients to specialists. The plaintiff apparently never employed a hygienist or other technical staff. He shared office space with other dentists over the years but operated his office independently. Before his disability claim, the plaintiff worked four days per week.

The parties' memoranda provide a thorough recitation of the facts, including the time period after the first surgery. This opinion will focus attention on the time frame following the second surgery, the period more proximate to the defendants' claim denial.

After the second surgery, prior to October 2001, the plaintiff returned to his office on a part-time basis. By August 2002, the plaintiff was working three and a half days per week. The parties dispute the exact duties the plaintiff resumed, but for the purpose of argument, the court will construe the evidence in a light most favorable to the defendants, the nonmoving parties on the contract claim. Despite his arthropathy, the plaintiff performed both diagnostic and clinical work in addition to his usual administrative tasks. (Diagnostic work includes examining teeth, reading x-rays and writing recommended treatment plans. Clinical work includes tasks such as cleanings, fillings, and extractions.)

As for the recitation of facts pertinent to the bad faith claims, suffice it to say the parties' memoranda recount in exhaustive detail an extensive claim history, replete with the specifics of phone conversations, claim-form content, physician statements – both written and oral, field reports, the state department of insurance proceedings and negotiations, as well as summaries of the plaintiffs appointment calendars and tasks performed pre- and post-disability.

A point that escapes the minutia in the parties' lengthy memoranda and voluminous exhibits is a key fact: the plaintiff remains unable to sustain a pincer grip, according to the undisputed opinion of his treating physician, Dr. Wolff. The defendants concede the plaintiff has "limitations caused by arthropathy in [his] right hand which required two surgical procedures," and that he is "unable to perform complicated dental restorative procedures, difficult extractions, molar root canals and heavy cleanings and scalings." (Docket no. 58 at p. 15).

### III.

**A. Contract Claim**

The plaintiff's hand surgeries clearly resulted in some measure of disability. The narrower question is whether the plaintiff's physical impairment qualifies him for "Total Disability" benefits under the terms of the policy. The exercise of interpreting contracts is typically an issue of law delegated to the court for determination and, contrary to the defendants' argument, falls outside the fact-finding province of a jury. *See Motorist Mutual Ins. Co. v. Hammond*, 355 F.3d 593 (6th Cir. 2004). This court, sitting in diversity, must apply the law of the forum state. *See Ginsburg v. Insurance Co. of North America*, 427 F.2d 1318, 1320-21 (6th Cir. 1970).

The policy at issue simply states, in relevant part, "'Total Disability' means the inability

of the Insured to perform the duties of his regular occupation." (See the last page of the policy, which is attached as exhibit 1 to appendix A, (docket no. 57), affidavit of Nicole L. St. Hilaire.)

The phrase "total disability" as interpreted under Kentucky law has received scant attention in reported decisions of the United States Court of Appeals for the Sixth Circuit and the Kentucky Supreme Court. In *Ginsburg v. Insurance Co. of North America*, *supra*, the Sixth Circuit considered whether under Kentucky law a nurse anesthetist must prove that her back injury rendered her unable to perform every task of her occupation to qualify as "permanently and totally disabled" as specified in her contract. The court reasoned that such a high standard of disability "strains both the policy language and common sense." The court continued, "We believe that the proper construction is that she may recover if she is unable to perform the duties substantially required for her to obtain employment as a nurse-anesthetist." *Id.* Because the insured could not perform "at least one essential task," the evidence supported the jury verdict in the insured's favor. *Id.* at 1321.

*Ginsburg* offers limited guidance for the interpretation of the disability provision at issue, and the reported decisions of the Kentucky Supreme Court similarly yield no discussion squarely on point. This court must, therefore, "predict what the Kentucky Supreme Court would do if confronted with the same question." *See Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). The court is persuaded the plaintiff would prevail on the contract claim.

Kentucky law of insurance contracts recognizes two rules of contract interpretation. First is the doctrine of ambiguity. If an insurance contract is subject to two interpretations, the court must construe the language in favor of the insured. *Woodson v. Manhattan Life Ins. Co.*, 743 S.W.2d 835, 839 (Ky. 1987). The second is the doctrine of reasonable expectations, a corollary

to strictly construing ambiguities against the insurer. "The gist of the doctrine is that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy. Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat the expectation." *Id*.

The plaintiff insured advocates a simple interpretation of the policy consistent with *Ginsburg*, that is, he is "totally disabled" in his regular occupation of general dentistry because his impaired pincer grip renders him unable to perform at least one essential duty. According to the testimony of expert witness, Dr. Doyle Freano, (a practicing dentist), the plaintiff is unable to control a high speed drill, handle a "handpiece," or perform surgery, crown preparation, and endofile, because of weakness, tremors, and an ineffective pincer grip. Dr. Freano explained that a high speed drill used in dental procedures "can cut anything you touch, whether it's a tooth or any soft tissue or the bone." (Docket no. 58 at p. 20.) The inability to use a high speed drill, alone, would seem to satisfy a policy interpretation consistent with *Ginsburg*.

The defendants concede *Ginsburg* stands for the proposition that "there may be circumstances in which a single duty is so fundamental to a particular occupation that the inability to do it renders one totally disabled." (Docket no. 62 at p. 6.) The defendants do not dispute the plaintiff's arthropathy or pincer grip limitation, *per se*, or specifically the plaintiff's inability to use a high speed drill, as far as the court can determine. Rather, the defendants distinguish *Ginsburg* based on the fact, there, that the nurse anesthetist was not able to intubate patients – thereby interpreting the *Ginsburg* standard as the inability to perform a "fundamental," or one might say, "super-essential," duty. The defendants' reading of *Ginsburg* is not persuasive.    The defendants further attempt to marginalize *Ginsburg's* reach because the

-6-

opinion fails to address the notion that the descriptive "total" suggests "lesser degrees of disability." (Docket no. 62 at p. 7.) Indeed, the "lesser degrees of disability" language finds citation in Kentucky cases dated prior to 1952, which apparently predate the appearance of "own-occupation" policies. The defendants cite these points and authorities for the proposition that the defendants advocate a better rule of interpretation.

The better way to interpret the policy at issue, according to the defendants, in essence is this: because the plaintiff can perform many, if not most, of the duties he performed pre-disability, that is, prior to the onset of arthropathy, the plaintiff satisfies the definition of "partially disabled" rather than "totally disabled." The defendants underscore the fact that the plaintiff was offered, but declined to purchase, partial disability insurance. Thus, because "total" implies lesser degrees of disability, the plaintiff's disability fails to satisfy the terms of his policy. Another premise of the defendants' interpretation is that the court must construe "regular occupation" not in terms of a hypothetical dentist in general practice, but in the actual context of the plaintiff's pre-disability practice. Assuming this premise for purposes of argument, the court concludes the defendants' proposed interpretation is logically flawed and contrary to *Ginsburg's* application of Kentucky law.

The fundamental error in the defendants' analysis lies in the inclusion of a term that appears nowhere among the policy definitions of the policy (as exhibited in the appendix to docket entry 57). The policy plainly speaks in terms of "total," not "partial" disability. Kentucky law disfavors implied terms as a basis for denying claims. Instead, the Kentucky doctrines of ambiguity and reasonable expectations require interpreting insurance contract to effect the "plain and clear" meaning of its terms. The issue of "partial disability" is not a legally

satisfactory basis to rule for the defendants.

At bottom, the defendants' proposed interpretation is no better than the at-least-one-essential-duty method of construction originated in *Ginsburg*. *Ginsburg* offers a more persuasive interpretation of the term "total disability" in light of its application of recent-era Kentucky case law, which observes rules for the strict construction of policies, subject to various interpretations, against an insurer.

Under the plain and explicit terms in the policy, the court concludes the plaintiff's undisputed pincer grip limitation renders him unable to perform at least one, if not many, essential duties of his regular occupation in dentistry. More simply, a dentist who cannot drill is not a dentist at all. The court will grant the plaintiff summary judgment on the contract claim. Before entering a final order, however, the court will require the parties to submit brief memoranda on the issue whether a calculation of damages should appear in the order of judgment.

## B. Bad Faith Claims

Under Kentucky law of bad faith, "a single test exists for the merits of bad-faith claims, whether brought ... under common law or statute." *Rawe v. Liberty Mutual Fire Ins. Co.*, — F.3d — , slip copy, No. 05-5485 (6th Cir. 2006). To prevail against an insurer for an alleged bad faith refusal to pay an insured's claim, the insured must prove three elements: 1) the terms of the policy obligate the insurer to pay the claim; 2) the denial of the claim lacked a reasonable basis in law or fact; and 3) the insurer knew, or recklessly disregarded that, no reasonable basis existed for denying the claim. *Id*.

The defendants in their motion for summary judgment contend that a reasonable basis

existed for denying the claim. The plaintiff moves for summary judgment on the first two elements of bad faith and rely on the testimony of expert witness, Mary Fuller. The plaintiff argues her testimony and a "market conduct examination report of UNUMProvident," (see docket no. 71 at p. 10.), support the contention that the defendants failed to comply with standards for fair handling of insurance claims.

The court has omitted lengthy recitation of the claim history from its opinion because the plaintiff's claim fails to establish that the insurer lacked a reasonable basis in law or fact to deny the claim. "If a genuine dispute does exist as to the status of the law governing the coverage question, the insured's claim is fairly debatable and the tort claim for bad faith based upon the insurer's refusal to pay the claim may not be maintained." *Graham v. Gallant Ins. Group*, 60 F.Supp.2d 632 (W.D.Ky. 1999). Although the court appreciates the frustration of any insured initiated into a legal proceeding where contracting parties draw legal distinctions in favor of their own interpretation, the court concludes the defendants' claim denial was based not on an unreasonable legal position. Despite the court's rejection of their position, the defendants' reasonably, although erroneously, attempted to distinguish "partial" and "total" disability in light of the plaintiff's return to a part-time practice. Because the status of Kentucky law governing the interpretation of "totally disabled" is fairly debatable, the bad faith claims are legally insufficient as a matter of law.

The court concludes there is insufficient evidence from which a jury could find that the defendants lacked a reasonable, legal basis for denying the claim, an essential element of every claim of bad faith. The court will therefore grant summary judgment for the defendants on the bad faith claims.

DATE:

cc: Counsel of Record